UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

01 MAR 30 AM 11: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

RICKY L. BROOKS,                          }
                                          }
        Plaintiff,                        }
                                          }
v.                                        }        CASE NO. CV 99-B-2408-NE
                                          }
MARTIN INDUSTRIES, INC.,                  }
                                          }        **ENTERED**
        Defendant.                        }
                                          }        MAR 3   2001

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment filed by defendant

Martin Industries, Inc. ("Martin Industries" or "defendant"). The present action arises out of

claims by plaintiff Ricky L. Brooks ("Brooks" or "plaintiff") that his former employer, Martin

Industries, violated Title 1 of the American with Disabilities Act ("ADA") by discriminating

against him based on his disability, record of disability, or perceived disability, 42 U.S.C. §

12101, *et seq*, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2612, *et seq*. Upon

consideration of the record, the submissions of the parties, the arguments of counsel, and the

relevant law, the court is of the opinion that defendant's motion is due to be granted.

## I. FACTUAL SUMMARY

Plaintiff was on active duty during the Gulf War as a staff sergeant. (Plaintiff's Exhibit

("PX") A, Brooks Deposition at 110-11.)[1] In 1995, prior to his employment with defendant,

plaintiff was diagnosed with Post Traumatic Stress Disorder ("PTSD"). (PX A at 92; *see also*

PX D, Depo. of Dr. Thomas Shafer, at 15.) According to Dr. Thomas Shafer ("Shafer"), people

---

[1] Throughout this opinion references to plaintiff's exhibits will be cited as "PX" followed by the corresponding tab; references to defendant's exhibits will be cited as "DX" followed by the corresponding tab.

with PTSD generally work well "in situations where they do . . . time-limited tasks" such as those which permit the person to perform tasks that take a day or two and then allow the person to move on to another task. (PX D at 19-20.)[2] Based on his examination of plaintiff, Shafer determined that as a result of PTSD, plaintiff has difficulty getting close to family members, suffers from chronic fatigue, sleep disturbance, nightmares, mood swings, episodes of anger, and general difficulty tolerating routine life stresses at home, school, and work. (PX D at 27.) Plaintiff claims he is substantially limited in the major life activities of working, sleeping, relaxing, and interacting with others in social and work settings. (Brooks Affidavit, PX E at ¶ 3.)

Defendant employed plaintiff as a multicraft mechanic in March of 1997. (PX A at 33, 77-78.) As a multicraft mechanic plaintiff worked in the maintenance department. (PX A at 77.) Within the maintenance department, there are approximately six or seven multicraft mechanics, all of whom must be capable of performing the functions of every maintenance job in the plant, including the repair of forklifts. (PX B, Depo. of Jeff Siniard, at 28-29.) Plaintiff was initially assigned to perform maintenance work throughout the plant, working on the floor with machinery and electrical equipment and receiving assignments to be completed throughout the work day or within a short number of days. (PX A at 77-78.) Later, plaintiff was assigned to the forklift repair area to repair forklifts, where he remained throughout his employment. (PX A at 78-79.)

In November of 1997, plaintiff informed David Bates ("Bates"), the manager of the maintenance department at Martin Industries at that time, and Brent Morgan ("Morgan"), the

---

[2] Plaintiff's evidentiary submissions include deposition excerpts with no cover page listing the deponent's name. The court has made an educated guess as to the deponent based on the nature of the testimony.

2

plant superintendent, that he suffered from PTSD and depression. (Brooks at 32-36.) In early April, 1998, plaintiff presented Bates with a letter from his doctor, Shafer, explaining that plaintiff suffered from PTSD. (DX 1 at 53-56.) The letter was placed in plaintiff's personnel file. (PX B, Depo. of Jeff Siniard at 78.) Plaintiff asserts that work in the forklift shop increased his stress level because of his inability to complete the never-ending task of repairing forklifts, what he considers unsafe working conditions, and the constant demand for repairs by forklift operators. (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Brief") at 3.) In late April or early May of 1998, plaintiff approached Bates and informed him that because the stress associated with working in the forklift shop was bothering him he wanted: (1) to be moved out of the forklift shop completely and placed in a general floor position for multicraft mechanics; (2) for another employee to be assigned to assist him in the forklift shop; or (3) to be periodically rotated from the forklift shop to the floor with other multicraft mechanics. (DX 1 at 52-53.)

On May 10, 1998, plaintiff requested leave for four weeks due to gall bladder surgery and a cholecystectomy. (PX A at 178-79.) After returning to work,[3] on July 22, 1998, plaintiff and Bates had a confrontation. (DX 7.) Bates told Morgan, the plant superintendent, that plaintiff had "bust[ed] into his office this morning while he was in conference." (DX 7.) Bates relayed to Morgan that plaintiff told him, "When you get through talking, I've got some sh*t I got to get off my chest," and "you're probably not going to like what I have to say." (DX 7.) In response, Bates told plaintiff, "please don't start any sh*t today." (DX 7.) Bates reported that plaintiff went off "cursing, ranting, and raving about nobody caring about him." (DX 7.) Bates

---

[3] The date plaintiff returned to work is unclear to the court.

3

stated that plaintiff called him and everyone in the front office an "SOB." (DX 7.) Bates also stated that as plaintiff was leaving his office plaintiff said, "Ya'll don't want me to go off out here in the plant. I've killed people without even thinking about it . . . ." (DX 7.)

Later on that same day, plant superintendent Morgan arranged a meeting between plaintiff, Bates, and himself to discuss the earlier confrontation. Morgan recorded his recollections of the meeting in a handwritten note. (DX 9.) When Morgan asked plaintiff to explain the earlier confrontation with Bates, "Ricky became very angry and started to attack [Bates] verbally." (DX 9.) Morgan stated that he stopped plaintiff and "reminded him we were here to talk civilized and to solve this problem. [Morgan] also reminded Ricky that [he] had warned him about his attitude just minutes before and reminded him again that if he lost his temper again on the floor, it would cost him his job." (DX 9.) Morgan stated that Bates then told plaintiff "if you didn't want to work on forklifts or if you were going to continually lose your temper and complain, you might as well get your tools and leave." (DX 9.) Morgan and Bates then asked plaintiff if he wanted to continue working at Martin Industries and told him he would work "primarily on forklifts and warned him again that this kind of behavior, that occurred this morning, would not be tolerated anymore or he would lose his job." (DX 9.) Plaintiff received no disciplinary action under defendant's progressive discipline policy for the July 22, 1998, incident with Bates. (PX A at 69, 190.)

On August 3, 1998, another incident between plaintiff and a Martin Industries employee occurred. (DX 8.) The employee asked plaintiff where the weedeater string was located. (DX 8.) Plaintiff told the employee it wasn't his "f**king job, what the f**k do you want me to do about it, it's the f**king operator's job." (DX 8.) Plaintiff was terminated after the incident. (PX A at 67; PX B at 47-48.) According to defendant, plaintiff was terminated due to several

4

incidents similar to this one where plaintiff was "angry, disrespectful, and us[ed] vulgar language," and other "verbally abusive incidents." (DX 10.) Plaintiff had been previously warned about his conduct and the plant manager explained to plaintiff that "[Martin Industries] could not continue to have our employees upset because of your behavior." (DX 10.) Plaintiff responded that "he was not angry, 'that is just the way [he is].'" (DX 10.) Present at the meeting when plaintiff was terminated was Jeff Siniard, Plant Manager, David Bates, Maintenance Supervisor, and June Marlin, Human Resource Manager. (DX 10.)

Plaintiff states that he was told that people were "nervous" around him. (PX A at 76.) He stated that Bates said to plaintiff or in plaintiff's presence: (1) "Rick, don't go postal on us;" (2) "Look out, here comes that crazy motherf**ker;" and (3) Watch him, he's crazy," (PX A at 71-74.) Plaintiff also testified that after he was fired he ran into a Martin Industries employee who said that defendant's management was worried plaintiff would return to work and kill someone. (PX A at 77.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A.    Collateral Estoppel

Plaintiff filed for unemployment prior to filing this lawsuit. (PX A at 112.) In its initial brief in support of its Motion for Summary Judgment defendant states that "[a]fter an investigation and hearing, the hearing officer found that Brooks was discharged because of abusive conduct and reduced benefits." (Def.'s Brief at 16.) No evidence is cited for this argument. Defendant later cites to plaintiff's testimony that his benefits were reduced for one month. (PX A at 113-115.) Contrary to defendant's argument, plaintiff's testimony does not establish that there was an investigation and hearing, nor does it establish that a hearing officer found plaintiff was discharged because of abusive conduct.

In support of its argument that plaintiff is collaterally estopped from presenting his discharge claim, defendant cites to *Stafford v. True Temper Sports*, 123 F.3d 291, 294 (5th Cir. 1997). In *Stafford* the court held that federal courts must give an agency's fact finding the same preclusive effect, under collateral estoppel, that they would give a decision of a state court where the agency acts in a judicial capacity and there is a fair opportunity to litigate. Defendant also cites to *Wal-Mart Stores, Inc. v. Smitherman*, 743 So. 2d 442, 448 (Ala. 1999), which held that

plaintiff was collaterally estopped from relitigating the reason for her discharge because she had
an opportunity to litigate the issue in her unemployment claim.

In *Smitherman*, the plaintiff filed a retaliatory discharge claim. *Smitherman,* 743 So. 2d
at 443. Smitherman alleged that during the course of her employment she developed carpal
tunnel syndrome in both hands. *See id.* She had surgery on her left hand in December 1995, and
on her right hand in June 1996. *See id.* Plaintiff returned to work in August 1996. *See id.*
"Smitherman allege[d] that on September 30, 1996, she injured her right shoulder. She [stated
that] the next day she notified Wal-Mart of her injury." *Id.* On October 4, 1996, Wal-Mart
terminated Smitherman's employment because "it said, she had made a profane and derogatory
remark about the district manager of Wal-Mart's pharmacy departments." *Id.* Smitherman filed
a claim for unemployment compensation benefits. *See id.* at 444. "On October 24, 1996, the
examiner determined that Smitherman was partially disqualified from receiving unemployment-
compensation benefits . . . [because she was] discharged from (her) most recent bona fide work .
. . [for misconduct connected with her work.]" *See id.* (citing ALA. CODE § 25-4-78(3)c (1975)).
Smitherman appealed the examiner's determination to the appeals tribunal and then to the board
of appeals. *See id.* "Because her application was denied, she had the right to appeal the appeals
referee's decision to the appropriate circuit court for a trial de novo." *Id.* "However,
Smitherman elected not to file such an appeal. As a result, the decision of the appeals referee
finding Smitherman partially disqualified from receiving unemployment-compensation benefits
became final." *Id.* According to *Smitherman*, collateral estoppel applies when the following
elements are present: (1) an identity of the parties or their privies; (2) an identity of issues; (3)
the parties had an adequate opportunity to litigate the issues; (4) the issues to be estopped were

7

actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision. *See id.* at 445.

The Supreme Court of Alabama found that the issue of whether Wal-Mart discharged Smitherman for making a profane and derogatory remark about a superior was present in both the unemployment-compensation proceeding and the retaliatory-discharge action. *See id.* at 446. The court also found that Smitherman had an adequate opportunity to litigate this issue. *See id.* "The record shows that the appeals referee conducted a hearing regarding Smitherman's claim for unemployment-compensation benefits and that Smitherman and her attorney, as well as Wal-Mart's attorney and a representative of Wal-Mart, appeared at the hearing. While the record on this appeal does not contain a transcript of that hearing, the appeals referee did make findings of fact based on the testimony and other evidence presented by the parties." *See id.* The court also held that "[t]he reason for Smitherman's discharge was actually litigated in the administrative proceeding and was actually determined by the appeals referee." *Id.* at 447. The court also found that "[t]he appeals referee's finding regarding the reason for Smitherman's discharge was necessary to the determination of whether Smitherman was entitled to unemployment-compensation benefits." *Id.* at 447.

"Smitherman argue[d] that she did not have an opportunity to litigate the issue of whether Wal-Mart's stated reason for her discharge was  a pretext for an otherwise impermissible termination. . . . We disagree. Smitherman had the burden of proving that she was not discharged from Wal-Mart for making a profane and derogatory remark about Wal-Mart's district manager of its pharmacy departments." *Id.*  The court stated that, "'[t]o allow a plaintiff to raise the same issues in a subsequent lawsuit after having elected not to appeal from the administrative ruling would frustrate efforts to provide an orderly administration of justice and

8

could encourage one to relitigate issues rather than have those issues finally resolved.'" *Id.* at 448 (quoting *Ex parte Smith*, 683 So. 2d at 436).

In the present case, defendant argues that plaintiff was penalized one month's unemployment pay because defendant asserted that plaintiff was terminated for cause.[4]  Plaintiff testified that there were no hearings regarding his claim for unemployment.  (PX A at 114.)  The record does not support a conclusion that plaintiff had a fair opportunity to litigate the issue of whether he was dismissed for cause in an unemployment compensation hearing.  The record does not show that plaintiff presented evidence of his disability to the unemployment office or whether the administrative proceeding addressed plaintiff's discrimination claim.  Additionally, there is no evidence that allowing plaintiff to bring his claims in this court would frustrate the orderly administration of justice.  Therefore, plaintiff is not collaterally estopped from bringing his claim.

## B.      Plaintiff's ADA Claim

### 1. Prima Facie Case

The ADA prohibits "discriminat[ion] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA

---

[4] As noted earlier, the evidence cited by defendant for this argument, DX 1 at 113-15, does not fully support defendant's position.  In defendant's reply brief defendant argues that, "[i]n the present case, it is clear that the hearing officer in the unemployment benefits hearing determined plaintiff had been discharged because of abusive conduct."  (Def.'s Reply Br. at 7.)  No evidence is cited in support of this argument.

9

claims." *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1226 (11th Cir. 1999). To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove the following elements: (1) that he has a disability; (2) that, with or without reasonable accommodations, he could perform the essential functions of his job; and (3) that he was discriminated against because of his disability. *Terrell v. U.S. Air,* 132 F.3d 621, 624 (11th Cir. 1998). Under the ADA, a person is considered disabled if he (1) suffers from a mental or physical impairment that substantially limits one or more of his major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). In this case, plaintiff claims he is disabled for purposes of the ADA because he suffers from post traumatic stress disorder ("PTSD"). For the reasons set forth below, the court is of the opinion that plaintiff has failed to establish that he has a disability as defined by the ADA. Therefore, he has not established a prima facie case of disability discrimination.

### a) Whether Plaintiff Has An Actual Disability

The mere presence of an impairment is not, by itself, sufficient to constitute a disability under the ADA. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir.1998). Rather, a disability exists only where the impairment substantially limits one or more major life activities. *See Sutton v. United Airlines,* 527 U.S. 471, 472 (1999). The Supreme Court has articulated a three-step inquiry for determining whether an impairment substantially limits a major life activity so as to constitute a disability under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624 (1998). First, the court must ascertain whether the plaintiff suffers from a physical or mental "impairment." *See id.* at 631. Next, the court must identify whether the life activity purportedly impacted by that impairment is a "major life activity." *See id.* at 637. Finally, the

10

court must determine whether the claimed impairment "substantially limits" that major life activity. *See id.* at 639.

### i. Impairment

In addressing the first step of this inquiry, the court notes that the ADA does not define the term "impairment." However, the Equal Employment Opportunity Commission ("EEOC") has promulgated regulations upon which the court may rely for guidance in interpreting the ADA. *See Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir.1996) (courts may seek direction from EEOC regulations implementing Title I of the ADA). A "mental impairment" is defined as a "mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

Plaintiff alleges that as a result of his PTSD, he has trouble getting close to family members, suffers from chronic fatigue, sleep disturbance, nightmares, mood swings, episodes of anger, and general difficulty tolerating routine life stresses at home, school, and work. (PX D at 27.) Defendant does not dispute that plaintiff suffers from a mental impairment as a result of his PTSD. (Def.'s Brief at 3.) The court will thus assume for the purpose of this analysis that plaintiff's PTSD is an impairment within the meaning of the ADA.

### ii. Major Life Activity

The court must next determine whether any of the life activities purportedly impacted by plaintiff's mental impairment are "major life activities." The ADA does not define this term, but the EEOC regulations explain that major life activities are basic activities that the average person in the general population can perform with little or no difficulty. *See* 29 C.F.R.§ 1630.2(j)(1)(i). Major life activities include, but are not limited to, activities such as "caring for oneself,

11

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."
29 C.F.R. § 1630.2(i) (list of enumerated major life activities is not exhaustive). Plaintiff argues
that his PTSD limits his major life activities of working, relaxing, sleeping, and interacting with
others in social and work settings. (PX E, Brooks Aff., at ¶3.) Working is a major life activity
under the ADA. The court will assume, without deciding, that sleeping and interacting with
others[5] are major life activities under the ADA. The court does not consider relaxing to be a
major life activity.

### iii. Substantial Limitation

The final step in the disability analysis is to determine whether plaintiff's mental
impairment "substantially limits" a major life activity. Because the ADA does not define
"substantially limits," the court again turns to the EEOC regulations for guidance. According to
those regulations, a physical or mental impairment is "substantially limiting" if the individual is
either "[u]nable to perform a major life activity that the average person in the general population
can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which
an individual can perform a particular major life activity as compared to the condition, manner,
or duration under which the average person in the general population can perform that same
major life activity." 29 C.F.R. § 1630.2(j)(1). In further discussing the "substantially limits"

_____

[5] In *McAlindin v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999), amended by
201 F.3d 1211 (9th Cir. 2000) the Ninth Circuit held that interacting with others is a major life
activity. However, the court held, in order to show a substantial limitation, "a plaintiff must
show that his 'relations with others were characterized on a regular basis by severe problems, for
example, consistently high levels of hostility, social withdrawal, or failure to communicate when
necessary.'" *Id.* (citation omitted). On the other hand, the First Circuit has questioned whether
"ability to get along with others" should be considered a major life activity under the ADA. *See
Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir. 1997) (noting that "'ability to get
along with others' is remarkably elastic" and noting further that "[t]o impose legally enforceable
duties on an employer based on such an amorphous concept would be problematic.")

12

definition, the Supreme Court has noted that the term "substantially" suggests a limitation that is "considerable" or "specified to a large degree." *See Sutton*, 527 U.S. at 490-91 (citing Webster's Third New International Dictionary 2280 (1976); 17 Oxford English Dictionary 66-67 (2d ed.1989)).

Defendant argues that plaintiff's PTSD does not rise to the level of a disability under the ADA because it does not substantially limit any of his major life activities. In determining whether an impairment is substantially limiting, courts look to: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or expected long-term impact of the impairment. *See Gordon*, 100 F.3d at 911 (citing 29 C.F.R. § 1630.2(j)(2)). With these principles in mind, the court will address whether the effects of plaintiff's PTSD substantially limit his ability to sleep, work, or interact with others.

### Working

In order for a physical or mental impairment to substantially limit the major life activity of working, the impairment must significantly restrict a person's "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). On the other hand, the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 491.

Plaintiff asserts that working in the forklift shop has increased his stress level which exacerbates his PTSD. (PX E at ¶ 10-11.) According to Dr. Shafer, a lot of his patients with PTSD "have done well working in situations where they do sort of time-limited tasks without a

13

lot of supervisors breathing down their necks . . . ." (PX D at 19-20.) Plaintiff has presented no evidence that his PTSD prevents him from performing an entire class of jobs. There is no evidence before the court that plaintiff's PTSD has substantially limited his ability to perform the work he has performed throughout his employment with Martin Industries or precluded him from performing an entire class of jobs. Thus, plaintiff has failed to demonstrate that his PTSD significantly restricted his ability to work.

### Sleeping

Plaintiff also asserts that he is substantially limited in the major life activity of sleeping.[6] (Pl.'s Brief at 9.) According to Shafer, plaintiff complained of chronic fatigue, sleep disturbances, and nightmares. (PX D at 27.) There is no evidence before the court as to the nature and severity of the impairment, the duration or expected duration of the impairment, or the expected long-term impact of the impairment. Thus, plaintiff's evidence is insufficient to support a conclusion that plaintiff is substantially limited in his ability to sleep.

In *Maynard v. Pneumatic Prods. Corp.*, 233 F.3d 1344, 1349 (11th Cir. 2000), the Eleventh Circuit clarified that in order to establish a prima facie case under the ADA, a plaintiff must present comparative evidence to demonstrate his or her substantial limitations. The court held that, "[a]n ADA complainant who alleges that an impairment significantly restricts performance of a major life activity must present some evidence of how well the average person in the general population performs the major life activity in question." *Id.* at 1350. Here,

---

[6] As noted earlier the court will assume that sleeping constitutes a major life activity under the ADA. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) ("We hold that sleep is a major life activity . . . . Sleeping is a basic activity that the average person in the general population can perform with little or no difficulty, similar to the major life activities of walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching.").

14

plaintiff failed to present comparative evidence.  For this additional reason, plaintiff has not established that he is substantially limited in his ability to sleep.

### Ability To Interact With Others

Plaintiff asserts that he is substantially limited in the major life activity of interacting with others.  (Pl.'s Brief at 9.)  Shafer determined that because of PTSD, plaintiff has difficulty getting close to family members, mood swings, episodes of anger, and difficulty tolerating stress.  (PX D at 27-29.)  There is evidence that plaintiff had occasional confrontations with his co-workers.  (*See* DX 7, 8, 9.)  However, even assuming that interacting with others is a major life activity, "[m]ere trouble getting along with co-workers is not sufficient to show a substantial limitation."  *McAlindin,* 192 F.3d at 1235.  Because plaintiff has not shown a significant impairment in his ability to interact with others, he has not established that he is substantially limited in this alleged major life activity.

### b)  Whether Plaintiff Has A Record Of A Disability

Even if a plaintiff does not have an actual disability, he will be considered disabled under the ADA if he can demonstrate that he has a record of disability.  Plaintiff contends that he can invoke the protection afforded by the ADA because he has a record of a substantially limiting impairment.  (Pl.'s Brief at 11.)  *See* 42 U.S.C. § 12102(2)(B).  The court disagrees.

An individual with a record of disability is a person who has "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k).  This part of the disability definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment.  *See id.*  One purpose of this provision is to prevent discrimination against individuals because of a history of disability.  *See id.*  The other purpose is to ensure that

15

individuals are not discriminated against because they have been misclassified as being disabled, such as a person who is erroneously classified as having a learning disability. *See id.* In order to prevail on this prong of the ADA, a plaintiff must show that at some point in the past, the employer relied upon a record which either classified or misclassified that individual as having a physical or mental impairment that substantially limits a major life activity. *Phillips v. Wal-Mart Stores, Inc.*, 78 F. Supp. 2d 1274, 1286-87 (S.D. Ala. 1999).

Plaintiff verbally made his employer aware of his history of PTSD and provided defendant with written documentation of his condition. (PX A at 32-36, 46; DX 1 at 53-56; PX E at ¶ 10.) While this may show that defendant was aware that plaintiff suffered from PTSD, plaintiff has not produced any evidence that defendant had a record of an impairment that substantially limited the major life activity of working on any other major life activity. *See Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1121 (5th Cir. 1998) (noting that prior back surgery and leave of absence tend to prove record of impairment, but do not show that such impairment substantially limits a major life activity); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 192 (5th Cir. 1996) (Defendant's knowledge of plaintiff's cancer was insufficient to establish a "record of" definition of disability where nothing in plaintiff's personnel file indicated plaintiff was substantially limited by a physical or mental impairment in her ability to perform her job.); *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1360 (S.D. Fla. 1999) ("[The] affidavit states that nothing in [plaintiff's] personnel file ever indicated that she was substantially limited by a disability, either in her ability to perform her job or in any other respect.").

16

### c) Whether Plaintiff Was Regarded As Having A Disability

Plaintiff also asserts that he meets the ADA standard for disability because he was regarded by defendant as having a substantially limiting impairment. (Pl.'s Brief at 12.) Plaintiff asserts that the derogatory remarks made to plaintiff about his disability[7] demonstrate that defendant regarded plaintiff as disabled. (Pl.'s Brief at 13.) The court disagrees.

There are two ways in which an individual may invoke this statutory definition: (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual nonlimiting impairment substantially limits one or more major life activities. *Sutton,* 527 U.S. at 489. "In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 489.

With respect to "perceived impairments," the Eleventh Circuit has observed: "As with real impairments, courts have held that a perceived impairment must be substantially limiting and significant. In this context, then, a significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks." *Gordon,* 100 F.3d at 913. (citations omitted).

There is no evidence before the court that plaintiff was perceived as being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various

---

[7] Plaintiff testified that Bates said to plaintiff or in his presence: (1) "Don't go postal on us," (2) Look out, here comes the crazy motherf**ker," and (3) "Watch him, he's crazy." (PX A at 71-74.)

classes. The evidence reflects that plaintiff was able to perform his duties in the forklift shop.

Martin Industries employed plaintiff as a multicraft mechanic without restriction, and did not

treat plaintiff as if he was limited in his ability to perform his job. Plaintiff has not put forth

sufficient evidence on which a reasonable jury could conclude that Martin Industries "regarded"

him as having an impairment that substantially limited a major life activity.

### 2. Legitimate, Nondiscriminatory Reason

Martin Industries has articulated a legitimate, nondiscriminatory reason for plaintiff's

termination. Defendant asserts that plaintiff was terminated due to offensive and threatening

remarks he made to other employees. (Def.'s Brief at 14.) Defendant cites three documented

instances in which plaintiff made threatening or abusive remarks to other Martin Industries

employees.

First, on July 22, 1998, plaintiff and Bates had a confrontation in Bates's office. (DX 7.)

Bates told Morgan, the plant superintendent, that plaintiff had "bust[ed] into his office this

morning while he was in conference." (DX 7.) Bates conveyed to Morgan that plaintiff had told

him that morning, "When you get through talking, I've got some sh*t I got to get off my chest,"

and "you're probably not going to like what I have to say." (DX 7.) In response, Bates told

plaintiff, "please don't start any sh*t today." (DX 7.) Bates reported that plaintiff went off

"cursing, ranting, and raving about nobody caring about him." (DX 7.) Bates stated that

plaintiff called him and everyone in the front office an "SOB." (DX 7.) Bates also stated that

plaintiff said, as he was leaving his office, "Ya'll don't want me to go off out here in the plant.

I've killed people without even thinking about it . . . ." (DX 7.)

The second incident occurred later that same day. (DX 9.) Plant superintendent Morgan

arranged a meeting with Bates, plaintiff, and himself to discuss the earlier confrontation. (DX

18

9.) Morgan stated that when he asked plaintiff to explain the event "Ricky became very angry and started to attack [Bates] verbally." (DX 9.) Morgan stated that he stopped plaintiff and "reminded him we were here to talk civilized and to solve this problem. I also reminded Ricky that I had warned him about his attitude just minutes before and reminded him again that if he lost his temper again on the floor, it would cost him his job." (DX 9.) Morgan stated that Bates then told plaintiff "if you didn't want to work on forklifts or if you were going to continually lose your temper and complain, you might as well get your tools and leave." (DX 9.) Morgan and Bates then asked plaintiff if he wanted to continue working at Martin Industries and told him he would work "primarily on forklifts and warned him again that this kind of behavior, that occurred this morning, would not be tolerated anymore or he would lose his job." (DX 9.)

The third incident occurred less than two weeks later, on August 3, 1998. (DX 8.) A Martin Industries employee asked plaintiff where the weedeater string was located. (DX 8.) Plaintiff told the employee it wasn't his "f**king job, what the f**k do you want me to do about it, it's the f**king operator's job." (DX 8.) According to defendant, plaintiff was subsequently fired due to several similar incidents in which plaintiff was "angry, disrespectful, and us[ed] vulgar language," and other "verbally abusive incidents." (DX 10.) Plaintiff had been previously warned about his conduct, and the plant manager explained to plaintiff that "[Martin Industries] could not continue to have our employees upset because of [his] behavior." (DX 10.) Plaintiff does not dispute these events. However, plaintiff contends that "he was not angry, 'that is just the way [he is].'" (DX 10.)

Defendant contends that despite a previous warning that termination would result from any further incidents, plaintiff conducted himself in a confrontational manner toward a co-worker. Thus, defendant has articulated a legitimate nondiscriminatory reason for terminating

19

plaintiff. That the *conduct* which resulted in his termination may have been the result of, or caused by, his disability does not save plaintiff's claims. *See Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352 (7th Cir.1997) (termination for excessively disruptive behavior and threats is justified since "[t]he [ADA] does not require an employer to retain a potentially violent employee"); *Williams v. Widnall*, 79 F.3d 1003, 1006-07 (10th Cir.1996) (an adverse action may properly be taken against a party because of an attribute caused by the handicap; employee was terminated not merely because of disability, but because he made threats against his supervisor and co-workers even when the actions were brought about as a result of the disability); *Newman v. Chevron U.S.A.*, 979 F. Supp. 1085, 1092 (S.D.Tex.1997) ("'an employee may not 'bootstrap his disease into the line of causation' by showing that the misconduct relied upon by the employer was caused by the disability.'") (quoting *Den Hartog v. Wasatch Academy*, 909 F. Supp. 1393, 1401 (D. Utah 1995)).

### 3. Pretext

If plaintiff had been successful in establishing a prima facie case, his claim would still fail in that he had not established that defendant's stated lawful reason for the adverse action was a pretext for disability discrimination. Under "pretext" analysis, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).   Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate,

20

nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Plaintiff has not produced evidence sufficient to discredit in the mind of a reasonable juror the nondiscriminatory reason advanced by defendant for its actions. In asserting that defendant's stated reason for his discharge was pretext for unlawful discrimination, plaintiff points to the statements made by Bates,"[8] that "verbal abuse of co-workers" was actually accepted at the plant, and that defendant failed to follow its own progressive discipline policy with regard to plaintiff's termination.

The comments attributed to Bates are not sufficient to establish that defendant's legitimate, non-discriminatory reason for discharging plaintiff was pretext for unlawful discrimination. Plaintiff does not dispute that the confrontations defendant cites took place. Nor has plaintiff offered any evidence that other employees were not terminated for similar behavior. Plaintiff's argument that profanity was commonplace in the working environment and that defendant failed to follow its progressive discipline policy also fail to establish pretext. Plaintiff

---

[8] *See supra* note 7.

21

was not terminated for using profanity in the workplace. Plaintiff was terminated because, after

being warned that his confrontational attitude would not be tolerated, he lashed out at another

co-worker. Plaintiff was specifically warned less than two weeks before he was terminated that

he would be fired if he again behaved in a confrontational manner. Therefore, defendant's

failure to follow its progressive discipline policy in this instance is insufficient to establish

pretext.

Plaintiff asserts that his case is analogous to *Damon v. Fleming Supermarkets*, 196 F.3d

1354 (11th Cir. 1999). In *Fleming Supermarkets*, the plaintiff sued alleging that he was

terminated in violation of the Age Discrimination in Employment Act ("ADEA"). *See id.* at

1357. In *Fleming Supermarkets*, defendant asserted that plaintiff was fired for yelling at and

directing vulgarities to a fellow employee where customers could overhear. *See id.* at 1365. The

court found that plaintiff submitted sufficient evidence of pretext to create a genuine issue of

material fact precluding summary judgment. *See id.* 1366. In support of its holding the court

cited evidence that other Fleming personnel engaged in the same conduct and were not fired.

*See id.* at 1366. Additionally, the court cited the decision-maker's desire to promote "younger

aggressive men," and pattern of demoting and firing numerous older managers in favor of

younger replacements. *See id.* at 1366.

*Fleming Supermarkets* is distinguishable from the present case. Plaintiff was not fired

for having a confrontation in the presence of customers. Plaintiff was fired after engaging in

outward hostility toward a co-worker, conduct he had been warned two weeks earlier would

result in termination. Further plaintiff has presented no evidence that other employees who were

also so forewarned after engaging in similar conduct were not terminated. Additionally, plaintiff

22

has not presented evidence that defendant was systematically demoting and eliminating its employees with disabilities in favor of other employees.

Defendant asserts that plaintiff was terminated for his disruptive, abusive, and threatening behavior. Plaintiff concedes that he engaged in this behavior. Standing alone, defendant's knowledge of plaintiff's PTSD is insufficient to establish pretext.[9] *See Christopher v. Adams Mark Hotels*, 137 F.3d 1069, 1073 (8th Cir. 1988) ("Mere knowledge of a disability cannot be sufficient to show pretext; otherwise, summary judgment for an employer would be appropriate only in cases where the employer is completely unaware of the plaintiff's disability."); *Biggs v. State of Florida Board of Regents*, No. 1:96-CV-185-MMP, 1998 WL 1069456 (N.D. Fla. Oct. 28, 1998) (knowledge of bipolar condition is insufficient alone to establish pretext). Because plaintiff has failed to put forth sufficient evidence that defendant's legitimate non-discriminatory reason for his termination was pretext for illegal discrimination based on plaintiff's disability, defendant is entitled to judgment as a matter of law on this claim.

**C.    Reasonable Accommodations[10]**

Discrimination under the under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an

---

[9] The court notes that Martin Industries knew that plaintiff suffered from PTSD when he was hired. (PX A at 33-34.)

[10] The court will address this claim even though it has concluded that plaintiff has not presented sufficient evidence to establish that he suffers from a disability.

accommodation is reasonable." *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d

1278, 1286 (11th Cir. 1997). Once the plaintiff has met his burden of proving that reasonable

accommodations exist, the defendant-employer may present evidence that the plaintiff's

requested accommodation imposes an undue hardship on the employer. *Willis v. Conopco, Inc.,*

108 F.3d 282, 285-86 (11th Cir. 1997). Plaintiff argues that defendant refused to provide him a

reasonable accommodation and retaliated against him for requesting an accommodation. (Pl.'s

Brief at 16.) Plaintiff asserts that with reasonable accommodations he could perform the

essential functions of his job. (Pl.'s Brief at 17.) Plaintiff contends that he asked for three

accommodations: (1) to be moved out of the forklift shop completely and placed in a general

floor position, (PX E at ¶ 12); (2) to be assigned an assistant to work with him in the forklift

shop, (PX E at ¶ 12); and (3) to be periodically rotated from the forklift shop to the floor with

other multicraft mechanics, (PX E at ¶ 12).

Defendant argues that it is entitled to summary judgment on plaintiff's accommodation

claim because plaintiff never requested an accommodation. (DX 1 at 53.) Defendant also

asserts that plaintiff never made clear to Martin Industries why he needed a change in his job

duties.

Defendant does not dispute that plaintiff provided notice of his PTSD, but contends that

Martin Industries had no notice regarding how plaintiff's PTSD affected his job. In order to

make out a case for failure to accommodate, an ADA plaintiff must demonstrate that he or she

actually demanded an accommodation. *See, e.g., Gaston v. Bellingrath Gardens and Home, Inc.,*

167 F.3d 1361, 1363 (11th Cir. 1999). Plaintiff argues that he made complaints about his job in

the forklift shop to his supervisor, that he asked for additional help, and that he asked for

reassignment. However, plaintiff never made specific reference to an "accommodation," (DX 1

24

at 53); he did not make a request in writing or submit a request to the Personnel Department

(DX 1 at 130-31); he did not ask his psychiatrist or psychologist to contact defendant and

construct an accommodation for him.  (DX 2 at 25, 36-37, 43-46; DX 3 at 21, 42-46.)  At his

deposition, plaintiff acknowledged that he never asked for an accommodation:

> Q.     "When you asked him to leave the forklift shop, did you ever tell
> him I need to leave because of my posttraumatic stress disorder?"
>
> A.     "I said because of the stresses, the stress is growing."
>
> . . .
>
> Q.     "Did you ever use the word accommodation?"
>
> A.     "Not to my recollection."

(DX 1 at 52-53.)  "In the 11th Circuit, an ADA Plaintiff as one 'who is in the best position to

know' what accommodation may be necessary, bears the burden of requesting the reasonable

accommodation 'at the time the disability presents a problem on the job . . . .'" *Biggs,* 1998 WL

1069456 at *6 (N.D. Ala. 1998) (citing *Fussell v. Georgia Port Authority*, 906 F. Supp. 1561,

1569 (S.D. Ga. 1995), *aff'd* 106 F.3d 417 (11th Cir. 1997)).

In this case, while plaintiff may have made requests for a change of job assignments,

plaintiff never provided notice of the reason for this request or otherwise participated in any

effort to assist Martin Industries in making the connection between his request and his disability.

A request for a lessening of pressure is too ambiguous to constitute a formal accommodation

request under the ADA.  *See Taylor v. Principal Financial Group*, 93 F.3d 155, 165 (5th Cir.

1996).[11]  Plaintiff has failed to adduce evidence which would allow a reasonable trier of fact to

find Martin Industries knew of any limitations arising out of plaintiff's PTSD.

**D.     Plaintiff's FMLA Claim**

In his Amended Complaint, plaintiff contends:

> 22.     On or around May 10, 1998, plaintiff applied for and took four weeks of
> Family and Medical Leave pursuant to defendant's Family and Medical
> Leave Policy due to a surgical procedure.
>
> 23.     Shortly thereafter, plaintiff was terminated for allegedly violating
> company policy.
>
> 24.     Plaintiff avers that defendant's proffered reason for terminating him was
> pretextual.
>
> 25.     Plaintiff alleges that defendant illegally terminated him because of his
> disability and/or because he applied for and used Family Medical Leave;
> refused to accommodate his disability and regarded him as disabled.

(Amended Compl. at pp 22-25.)

In plaintiff's brief in opposition to defendant's Motion for Summary Judgment, plaintiff does not

cite to *evidence* in support of these allegations.

---

[11] In *Taylor,* the defendant argued that "the claimed physical or mental limitations of an
employee's disability must be made known to the employer before an obligation to
accommodate arises." *Taylor,* 93 F.3d at 163.  In *Taylor,* the plaintiff suffered from bipolar
disorder.  *See id.*  He made two arguments.  First, the plaintiff argued that statements that he
"asked . . . for help," had "asked [defendant] . . . [to] find out some of the manifestations of this
disease," for "a reduction in [his] objectives," and a "lessening of the pressure," created a
genuine issue as to whether he had asked for a reasonable accommodation.  *Id.*  Second, plaintiff
argued that once he had revealed his disability to the defendant they had an affirmative
obligation to make a reasonable accommodation.  *See id.*  The Fifth Circuit affirmed the district
court's holding that plaintiff never requested an accommodation and, thus, failed to establish a
prima facie case of ADA discrimination.  *See id.*  The Fifth Circuit stated that **"[f]or purposes of
proving ADA discrimination, it is important to distinguish between an employer's
knowledge of an employee's disability versus an employer's knowledge of any limitations
experienced by the employee as a result of that disability."** *Id.* at 164.  (Emphasis added.*)*
The court noted that "[t]his distinction is important because the ADA requires employers to
reasonably accommodate limitations, not disabilities." *Id.*

When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct
evidence of the employer's intent, the court must apply the same burden-shifting framework
established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),
for evaluating Title VII discrimination claims. *See Brungart v. Bellsouth Telecomm. Inc.*, 231
F.3d 791, 798 (11th Cir. 2000). If plaintiff establishes a prima facie case, thereby giving rise to a
presumption of unlawful, disparate treatment, then at the second stage of analysis, the burden of
production shifts to defendant to rebut the presumption of intentional discrimination by
articulating legitimate, nondiscriminatory reasons for the contested employment action. *Dollar
v. Shoney's,* 981 F. Supp 1417, 1420 (N.D. Ala. 1977) (quoting *Texas Department of Community
Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The burden then shifts to the plaintiff who has an
opportunity to show by a preponderance of the evidence that defendant's stated reasons are mere
pretext for unlawful, discriminatory motives. (*Id.*)

To establish a prima facie case of retaliatory discharge or retaliation using the *McDonnell
Douglas* framework, plaintiff must establish that: (1) he engaged in statutorily protected activity;
(2) he thereafter suffered an adverse employment decision; and (3) there was a causal connection
between the two events. *Id.* at 798.

Defendant argues that plaintiff has failed to establish a prima facie case because he has
not established that he availed himself of a right protected by the FMLA. Defendant notes that
plaintiff's leave for gallbladder surgery was not designated by plaintiff as FMLA leave. (DX 1
at 178.) Defendant also argues that plaintiff has not demonstrated a causal connection between
his FMLA leave and defendant's decision to terminate plaintiff.

Plaintiff argues that defendant's assertion that he cannot establish a prima facie case due
to his failure to designate his requested leave as FMLA leave is incorrect. (Pl.'s Brief at 19.)

27

Plaintiff cites 29 C.F.R. § 825.302(c) and *Krohn v. Forsting,* 11 F. Supp. 2d 1082, 1090 (E.D. Mo. 1998), to support his contention that plaintiff's failure to designate his leave as FMLA leave does not prevent him from establishing a prima facie case. (Pl.'s Brief at 19.)  Second, plaintiff contends that the temporal proximity of his termination to his FMLA leave establishes the requisite causal connection.  (Pl.'s Brief at 20.)[12]

In their memoranda to the court, neither party addressed a point crucial to the plaintiff's prima facie case:  even assuming plaintiff engaged in protected activity, that is, took FMLA leave, did the decision maker with regard to plaintiff's termination know of plaintiff's protected activity?  As noted by the Eleventh Circuit in *Brungart*, "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart*, 231 F.3d at 799.

Plaintiff has offered no evidence, either direct or circumstantial on which a reasonable juror could conclude that anyone involved in the decision to terminate plaintiff knew of his protected activity.  In order to establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Brungart*, 231 F.3d at 799 (citations omitted).  Plaintiff has failed to establish this prong of his prima facie case because there is no evidence before the court that any decision maker was aware of plaintiff's protected conduct.

---

[12] Generally, close temporal proximity alone is sufficient to establish a prima facie case. *See Dollar v. Shoney's, Inc.*, 981 F. Supp. 1417, 1420 (N.D. Ala. 1997) (close temporal proximity between the protected activity and adverse employment action can satisfy the causal connection element); *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.").

Even assuming that plaintiff had established a prima facie case of retaliation based on plaintiff's use of FMLA leave, defendant has offered a legitimate, nondiscriminatory reason for terminating plaintiff's employment, to wit, defendant terminated plaintiff because he made threatening or abusive remarks to other Martin Industries employees. (DX 10.) Based on the exhibits and affidavits submitted in support of its Motion, defendant has carried its burden of proffering a legitimate, nondiscriminatory reason for its action. Because defendant has met its burden of articulating a legitimate non-discriminatory reason for terminating plaintiff, in order to avoid summary judgment plaintiff must put forth sufficient evidence that a reasonable jury could conclude that defendant's articulated reason is pretext for unlawfully terminating plaintiff due to plaintiff's exercise or the attempt to exercise a right to which he was entitled under the FMLA.

As discussed above, defendant contends that plaintiff's employment was terminated for a legitimate nondiscriminatory reason. Plaintiff disagrees but offers no arguments relating specifically to his FMLA claim. Plaintiff has failed to show that defendant's proffered reason was pretextual. For the same reasons discussed in the section discussing plaintiff's claim that he was discharged in violation of the ADA, the court finds that plaintiff's evidence does not create a genuine issue of material fact that defendant intentionally discriminated against him based on his alleged use of FMLA leave. Thus, defendant is entitled to judgment as a matter of law on plaintiff's FMLA claim.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law. An order in accordance with

this Memorandum Opinion will be entered contemporaneously herewith.

      **DONE** this 3th day of March, 2001.

<br>

                              **SHARON LOVELACE BLACKBURN**
                              United States District Judge